Heather Lopez (SBN 354022)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
280 S. Beverly Drive
Beverly Hills, CA 90212
Tel: (858) 209-6941
hlopez@milberg.com

William Edelman (SBN 285177)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Phone: 866.252.0878
wedelman@milberg.com

Christian Levis (*pro hac vice* forthcoming)
Amanda Fiorilla (*pro hac vice* forthcoming)
Rachel Kesten (*pro hac vice* forthcoming)
Yuanchen Lu (*pro hac vice* forthcoming)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com
rkesten@lowey.com
ylu@lowey.com

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT FOR THE

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOHN GINDER**, individually and on behalf of all others similarly situated,<br><br>  Plaintiff,<br><br>  v.<br><br>**META PLATFORMS, INC. and GOOGLE LLC,**<br><br>  Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff John Ginder ("Plaintiff") brings this class action complaint ("Complaint") individually and on behalf of all others similarly situated (the "Class Members"), against Meta Platforms, Inc. ("Meta" or "Defendant") and Google LLC ("Google" or "Defendant"). The allegations contained herein, which are based on Plaintiff's knowledge of facts pertaining to himself and his own actions and counsel's investigations, and upon information and belief as to all other matters, are as follows:

## NATURE OF THE ACTION

1. This case is about Meta's habitual practice of violating state and federal laws in the pursuit of ever-increasing profits, which it primarily derives from marketing services that require vast amounts of consumer data.

2. This case is also about Google's failure to deliver on its security promises to consumers, its negligence in designing an inferior product, and failure to notify Android users that their data was compromised.

3. As described in more detail herein, beginning in September of 2024, Meta developed a system for gaining unauthorized access to millions of Android devices by exploiting vulnerabilities in Google's Android operating system.

4. As a result of this, Meta was able to track, intercept, collect, and monetize massive amounts of sensitive data pertaining to specific individuals as those individuals used their internet browsers.

5. By design, this scheme was, and did, sweep in vast amounts of sensitive data from apps and websites that Meta did not own or operate, and accordingly that Meta would not have had access to and would not have been able amass relying on its Tracking Tools[1] alone.

6. By exploiting vulnerabilities in Android's operating system and design infrastructure, Meta gained a direct data-collection pipeline that syphoned off private "first party"

---

[1] As used throughout this Complaint, the term "Tracking Tools" refers to the various technologies Meta uses to intercept, collect, and monetize data belonging to Plaintiff and Class Members. These tools include the Meta Pixel, Meta SDKs, Meta's Conversions API tools, and related tools that help it track and identify specific individuals as they browse the internet and move across devices.

communications between individuals and the non-Meta apps and website they used that otherwise would not exist.

7. Importantly, Meta's surveillance and exfiltration of data would not have been possible if Google had upheld its contractual promise to consumers.

8. Despite Google's claims of robust privacy protections, Android's architecture contains fundamental design flaws that enabled Meta's covert tracking scheme.

9. Consequently, Plaintiff brings this action for legal and equitable remedies to address and rectify the illegal conduct and actions described herein.

10. As a result of Defendants' conduct, Plaintiff and Class Members have suffered numerous injuries, including invasion of privacy, loss of benefit of the bargain, diminution of value of their private information, statutory damages, and the continued and ongoing risk to their private information.

**THE PARTIES**

11. Plaintiff John Ginder is a resident of the State of California and is domiciled in Goleta, California. Plaintiff John Ginder was in California when he used the internet browser on his Android device to communicate sensitive private data.

12. Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business located at 1 Meta Way, Menlo Park, California 94025. Meta regularly conducts business throughout California and in this judicial district. Meta is one of the largest social media and advertising companies in the world, and it conducts its operations within this district.

13. Defendant Google is a Delaware limited liability company with a principal place of business that is officially known as The Googleplex, located at 1600 Amphitheater Parkway, Mountain View, California 94043. Google regularly conducts business throughout California and in this judicial district. Google is one of the largest technology companies in the world and conducts product development, research, and advertising operations in this district.

**JURISDICTION AND VENUE**

14. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) (the Class Action Fairness Act) because the amount in controversy exceeds $5,000,000, exclusive of interest

2

and costs, and a member of the Class is a citizen of a different state than Meta Platforms, Inc. and Google LLC. This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under 18 U.S.C. § 2510, *et seq.* (the Electronic Communications Privacy Act).

15.    This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

16.    This Court has personal jurisdiction over Defendants because Meta and Google both maintain their principal place of business in this District.

17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because both Defendants reside in this district.

## INTRADISTRICT ASSIGNMENT

18.    Pursuant to L.R. 3-2(c), assignment to this division is proper because a substantial part of the events and conduct which give rise to the claims herein occurred in Santa Clara County.

## FACTUAL ALLEGATIONS

19.    Plaintiff and Class Members utilize dozens of different mobile applications or "apps" to perform various tasks on their Android smartphones and tablets, including browsing the internet.

20.    Nearly every smartphone user has at least one internet browser app installed on their device. Similarly, tens of millions of Americans use apps own by Meta, such as the Facebook or Instagram apps, which are installed on millions of Android devices.

21.    Under ordinary circumstances, companies other than the smartphone manufacturer are not permitted to gain cross-access to apps they do not own or operate that are controlled by another company.

22.    However, because of security flaws in Android devices, Meta was able to use Facebook and Instagram apps on Android devices to directly associate first-party cookies on non-Facebook websites with the Facebook Account ID of each Facebook or Instagram user.

### A. Meta's Entire Business Model is Based on Surveillance.

23.     Meta essentially operates as a data broker and advertising conglomerate, leveraging vast amounts of user data to fuel its $130+ billion annual advertising business.

24.     Meta generates revenue by selling advertising space on its social media platforms (Facebook and Instagram), which relies on highly personalized consumer data.[2]

25.     In selling advertising space, Meta highlights its ability to target specific users,[3] and this ties into its requirement that Facebook function as a "real identity platform,"[4] meaning users are allowed only one account and must share "the name they go by in everyday life."[5]

26.     Meta's goal is to identify and track specific individuals as they move across the internet. To that end, when creating an account, Facebook users must provide their first and last name, along with their birthday and gender.[6]

27.     Meta's Tracking Tools are also aimed at tying specific individuals' online activities to their real-world identity for further use in marketing, and its decision to infiltrate Android devices helps Meta fill gaps and amass as much data about specific individuals as possible.

28.     For example, many of Meta's Tracking Tools, which are summarized below, played a role in exfiltrating Android users' data from Android web browsers, including Incognito and VPN sessions that occurred on Android devices.

29.     However, the Tracking Tools alone could not achieve the level of data collection Meta desired, and that's particularly true since Meta's scheme allowed it to engage in cookie matching, thereby matching specific individuals to their browsing history and communications.

30.     **The Meta Pixel.** The Meta Pixel is a piece of code that is embedded in approximately 5.8 million websites, and it tracks and collects users' online website activity and

---

[2] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[3] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[4] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[5] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[6] FACEBOOK, SIGN UP, https://www.facebook.com/.

communications.[7]    The Meta Pixel collects users behavior, page views, form submissions, purchases, search queries, device information, personal identifiers, persistent identifiers, and more. That said, the Pixel has its limitations, and this is especially true when users seek to be anonymous such as by using Incognito mode on Android devices, using the Firefox web browser, or implementing a VPN on their Android device.

31.    **Meta's SDKs.** Meta also offers software development kits ("SDKs") to app developers, which collect vast amounts of data from within mobile apps including time spent on the app, features used, social interactions, and more. However, Meta's SDKs could not, in and of themselves, access information, communications, and data being shared within web browsers on Android devices.

32.    As described in more detail below, Meta's Tracking Tools played a role in its exfiltration of Android users' data, but Meta would not have been able to access this data pipeline or open a backdoor into Android users' devices without its unscrupulous conduct.

33.    Meta's business model depends on maximizing data inflows to refine its advertising algorithms, and this latest scheme is yet another example of how far the company will go to maximize its profit.

**B. Meta Infiltrated Android Devices and Intercepted Android Users' Data from within their Devices.**

34.    This case is about Meta's collection of data from *outside* its own mobile apps and services and from *within* the internet browsers installed on Android devices—one of the most sensitive portions of every mobile device.

35.    Meta developed a sophisticated scheme to bypass Android's privacy protections, which thereby allowed Meta to link Plaintiff and Class Members' web browsing activities and communications to their real-world identities.

---

[7] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

36.     By opening a backdoor channel in Android devices, Meta gained unfettered access to millions of Android users' browsing histories, communications, sensitive data, and more, which it would not have otherwise had access to.

37.     This scheme exploited Android's lax architecture and modern web protocols to achieve what traditional tracking methods could not.

38.     For example, Android's "sandboxing" protocol normally prevents, or is intended to prevent, mobile apps from accessing each other's data.

39.     As a result of this, Meta is typically unable to link vast troves of internet browsing data to specific individuals when those individuals are using an Android device.

40.     However, Android allows mobile apps to open "listening sockets" on localhost ports for the limited purpose of executing video calls (Web RTC), which creates a major security threat within in Android's operating system.

41.     Meta exploited this vulnerability in Android's operating system and bypassed the sandboxing privacy protocol by encoding tracking IDs into protocols meant for video calls (Web RTC).

42.     Meta also hid cookies in Session Description Protocol fields, which are normally used for solely for connection setup.

43.     Additionally, Meta engaged in background monitoring whereby apps would run continuously to intercept localhost traffic even when the app was not in use.

44.     This scheme allowed Meta to achieve the following: (1) collect browsing data from websites embedded with its Tracking Tools; (2) circumvent Android's sandboxing to transfer this data to Meta's mobile apps via hidden local network channels, and (3) link anonymous web activity to specific users' Facebook accounts, thereby identifying specific users by their real-world identity, including when users implemented "Incognito Mode" within Google Chrome and used VPNs. By doing this, Meta was able to exfiltrate sensitive browsing data and communication, and connect that information specific individuals, which is something its Tracking Tools alone could not accomplish on Android devices.

6

| Component | Role in Tracking Scheme |
|---|---|
| Meta Pixel | Embedded in 5.8 million websites, the pixel collects pages visited, granular information that reveals a website user's specific actions on a website (including the text and phrases they type, the buttons they click, and more), device identifiers, cookies, event data, and more. |
| Web Browser | The web browser loads websites. When the website in question contains the Meta Pixel, Meta can bypass privacy protocols and send tracking data to the localhost port. |
| Facebook/Instagram App | Listens in on preconfigured localhost ports, thereby allowing Meta to receive data directly from the Web Browser. |
| WebRTC/WebSocket | Transports Tracking data via protocols exclusively intended for video calls. |
| Meta Cookies | Android's sandbox normally prevents apps from accessing browser data. Meta bypassed this by using cookie syncing to match browser cookies with app-stored credentials. |
| Linking IDs | If the Android user is logged into the Facebook or Instagram mobile app, then Meta matches the browser cookies with the individual's Facebook/Instagram account credentials. This allows Meta to convert anonymous data to personally identifiable data, which it would not otherwise be able to do. |

45.     Meta's hacking scheme allows it to access and identify browsing data by associating it with individuals using a series of steps that can be summarized as follows: an Android user visits a website that contains the Meta Pixel → the Meta Pixel loads → the Script sends the relevant cookie and unredacted URL → the WebRTC/WebSocket encodes the data →

7

Localhost:12387 → the data travels to the Facebook App → Meta then matches the fbp cookie to User ID → Sends to Meta servers.

### *Meta's Linked the Data it Wrongfully Obtained to Specific Individuals*

46.    When a Facebook or Instagram user downloads the Facebook or Instagram app onto an Android device, Meta associates the users' unique device ID with their Facebook or Instagram account.

47.    Because most smartphones are used by a single person, the unique device ID provides a higher degree of identification than a name or address, and, by associating that unique device ID with a particular Facebook account, Meta is able to determine exactly who a person is.

48.    By contrast, identification of Facebook or Instagram users on a web-browser requires access to cookies and/or a combination of IP address and User-Agent.

49.    Third-party cookies are those that are set by companies like Meta on sites that they do not control but can directly identify Facebook or Instagram users. However, when third-party cookies are unavailable, companies like Meta rely on alternatives for identification, including unique first-party cookies set to appear as if they belong to a site other than Facebook or the combination of IP address and User-Agent.

50.    If a company like Meta can associate a first-party cookie with a stable and unique identifier or identifiers that exist on more than one website, it can map that first-party cookie to the stable identifier and then back to a person's Facebook account.

51.    However, there are typically security rules on computing devices that make this more difficult. For example, a tracking company should not be permitted to send signals to its own application (and its own servers) from another app without a clear contractual provision allowing it and disclosures to users. But in this case, that's exactly what Meta did.

52.    First, Meta's source code, which is integrated into millions of websites via the Meta Pixel, places a first-party cookie named _fbp on class members' Android devices when they are use their web browser. As a result, this value is sent back to Meta alongside the contents of the person's browsing communication with the non-Meta website.

53.    Second, the Meta Pixel Javascript commands the Android mobile web-browser to send the value of the first-party _fbp cookie to specific "ports" on the device.

54.    Third, the Facebook and Instagram apps listen for and collect the fbp cookie values on those specific ports.

55.    Fourth, once the Facebook and/or Instagram app collects the _fbp cookie, Meta then associates the fbp cookie value with the Android owners' unique device ID and Facebook User ID by sending the fbp cookie back to Meta along with other identifiers that link the fbp cookie to the Android user's Facebook Account.

56.    By carrying out this hack, Meta is then able to associate all browsing activity on any site where the fbp cookie is set back to the owner of the Android device. And because Meta's presence on the web is so large, it is then able to create a detailed browsing history and profile about the owner of the Android device that is tied to their real-world identity.

57.    Meta does not have consent from Google, the websites, or its users to engage in this hack.

58.    Meta would not have been able to collect specific individuals' internet browsing information and communications from within Android web browsers but for this purposeful scheme to take advantage of weaknesses in the Android operating system.

59.    Android has specific restrictions prohibiting Meta's conduct, and its policies do not allow apps—such as Facebook and Instagram—to directly access browser history or cookies from other apps.

60.    In addition to violating Android's protocols and policies, cross-app data sharing requires users' explicit consent, which was not provided by Plaintiff or Class Members.

61.    As a result of this scheme, Meta was able to tie specific communications and sensitive data to specific individuals for further exploitation and use in its marketing ecosystem.

62.    There is no legitimate purpose or technical justification for Meta's conduct.

63.    Meta's willingness to exploit vulnerabilities in one of its largest competitors operating system in its favor underscores just how far the company is willing to go in order to achieve mass surveillance in the name of ever-increasing profits.

**C. Google Falsely Advertised that its Android Products are Secure when, in reality, it Developed and offered a Technically Flawed System.**

64.     All Google Accountholders must agree to the Google Terms of Service.

65.     Users of the Android operating system are required to agree to the Google Terms of Service which are also listed as the Android TOS in Google's "List of services & service-specific additional terms" available at https://policies.google.com/terms/service-specific?hl=en-US.

66.     The Android Terms of Service link in the screenshot below takes Android users to the Google general Terms of Service:



*Figure 1.*

67.     Google's general Terms of Service incorporate its Privacy Policy by express reference:

> Besides these terms, we also publish a Privacy Policy. We encourage you to read it to better understand how you can update, manage, export, and delete your information ☑.

*Figure 2.*

68.     In the Google Privacy Policy, Google makes the following binding contractual promises:

> (a)     This Privacy Policy applies to all of the services offered by Google LLC and its affiliates, including YouTube, Android, and services offered on third-party sites, such as advertising services.
> (b)     We do not share your personal information with companies, organizations, or individuals outside of Google except in" a list of circumstances that do not apply.

(c)    We restrict access to personal information to Google employees, contractors, and agents who need that information in order to process it.

(d)    We don't share information that personally identifies you with advertisers unless you ask us to.

69.    In addition, Google makes public security guarantees about Android at www.android.com/safety/security, as shown in the screenshots depicted below:



***Figure 3. Google represents that it provides "[p]owerful, proactive protection that's built right into your Android device to help keep your data safe."***



*Figure 4. Google represents that it "Industry-leading" security features, including "[p]roactive device scans for stronger security."*



*Figure 5.*



*Figure 6.*



*Figure 7. Google represents that "[o]ngoing updates provide fixes for possible issues and upgrade your device's safety features to help battle evolving threats."*

13



*Figure 8.*

70.    Google also makes public security guarantees about Android at www.android.com/safety/privacy, as shown in the screenshot depicted below:



*Figure 9.*

71.    Clicking on the button to "Learn more about protected computing" takes Google Accountholders to a blog post titled "How we achieve privacy through innovation" that was written by Google's Vice President of Engineering for Privacy, Safety, and Security and published

14

on February 1, 2023 at https://blog.google/technology/safety-security/how-we-achieve-privacy-through-innovation/. In the article, Google assures Google Accountholders that:

(vii) Over the last decade, Google has invested in AI and machine learning that has helped develop privacy-enhancing technologies (PETS), like federated learning, differential privacy and fully homomorphic encryption, which minimize and protect personal data. They do this by allowing for analysis of large data sets in a way where no person's information is ever disclosed. These technologies form the foundation of Protected Computing ….

(viii) For example, Android's Private Compute Core, a secure environment that is isolated from the rest of the operating system and apps, enables AI features like Smart Reply, Live Translate, Spam detection in Messages, and Cough & Snore detection. It does so while processing the information on-device, isolated so no other app on your device, or Google, can see that information…

(ix) Protected Computing: beyond on-device privacy

(x) We know that not everything can be processed on the device, like when you browse the web, backup your device data or make calls. But we also believe that you shouldn't have to worry about where your data lives when you're online. That's why Protected Computing is especially helpful in these scenarios, where it ensures that any data that leaves or is stored outside of the device remains private to you. For example, Google Virtual Private Network (VPN) encrypts network traffic and masks the IP address so that your online activity of app usage activities can't be linked with your account or identity. Another example of similar protection is Android Backup, which keeps your backed-up data end-to-end encrypted, even when it is stored in the cloud. Only you can access and decrypt this information, giving you exclusive control over your data.

(xi)                    …

(xii) Protected Computing paves the way for the next generation of innovative experiences, while raising the bar for privacy and safety. By minimizing the amount of data stored, de-identifying it so it is not linked to the user, and restricting access to it from others, Protected Computing will technically ensure the privacy and safety of your data.

(xiii) Visit the Safety Center to learn more about how we're protecting your data.

72.     Google also maintains a Privacy and Security page for Google Accountholders at https://safety.google/security-privacy/, where it makes the following statements:

15

*Figure 10. Stating that, "[w]ith one of the world's most advanced security infrastructures, our products are secure by default.*

*Figure 11.*



*Figure 12.*



*Figure 13.*

73.     Google also promises "Built-in Security" in its products for Google Accountholders at https://safety.google/security/built-in-protection/:



*Figure 14.*

*Figure 15.*

74.     Despite Google's promises to Android users regarding privacy and security, its architecture contains fundamental design flaws that enabled Meta's covert tracking scheme.

75.     These vulnerabilities stem from technical oversights, permission model weaknesses, and ecosystem fragmentation—issues that Apple's iOS largely avoids through stricter controls.

18

**D. Android's Technical Shortcomings.**

76.     Android's shortcomings facilitated Meta's surveillance, and the technical aspects of these flaws are summarized below.

77.     **Unrestricted Localhost Communication.** Android allows apps to open listening sockets on localhost ports without user consent or system-level monitoring, which thereby creates a hidden data channel between apps. Android's sandbox isolates app data but permits localhost traffic, allowing Meta to bridge the browser (web data) and app (user identity). By comparison, Apple restricts localhost communication to signed apps with explicit entitlements. Apps cannot listen on arbitrary ports without triggering iOS security alerts.

78.     **Permissive Permission Model.** Android's permissive permission model allows apps to request broad permissions that enable background network monitoring, and Android does not implement any granular controls for localhost traffic or inter-app communication. As a result, the Facebook and Instagram apps used the "internet" permission value to listen for localhost traffic indefinitely, even when the Facebook and Instagram apps were closed. Meta was able to further exploit this system because no user consent is required for port monitoring as a result of Android not classifying it as a sensitive permission. By contrast, Apple iOS requires apps to declare network/server entitlements and restricts background network activity. If Meta tried to listen-in on localhost ports on an Apple device, doing so would trigger a privacy warning.

79.     **Weak SELinux Sandbox Enforcement.** While Android uses SELinux to isolate apps, third-party apps share the "untrusted_app" context, allowing indirect sharing via unprotected channels like localhost. As a result of this, Meta's apps ran in the same SELinux domain as browsers, enabling them to intercept localhost traffic without violating mandatory access control policies. In turn, Meta exfiltrated data via WebRTC/WebSocket protocols because they were able to mask it as legitimate traffic. Contrast this with Apple, where iOS apps run in isolated sandboxes with unique entitlements. Additionally, communication between apps requires explicit user approval via app extensions or URL schemes.

19

80.    **Fragmented Updates and Patch Delays.** Android failed to deliver timely security updates, leaving devices vulnerable long after fixes were available, and critical vulnerabilities like [CVE-2025-1234 (Localhost Exfiltration)] persist on older devices.

81.    **Inadequate Default Protections.** Despite Google's claims to the contrary, Android fails to offer basic privacy protections, and falls far short of delivering on it promise to provide Android users with "the world's most advanced security." Even if users enable Incognito Mode for every internet browsing session, doing so does not block localhost traffic or app background activity. Additionally, Android's system allows apps to read/write to shared directories, thereby enabling covert data staging. Meta capitalized on this vulnerability, which allowed it to track and intercept users' communications—even when the user was implementing Incognito Mode—by intercepting requests before encryption. By comparison, iOS's incognito mode equivalent (Safari Private Browsing) blocks all network traffic to apps and disables JavaScript trackers.

82.    Android's technical failures, combined with slow updates, create an ecosystem where Google's "private by default" claim is fundamentally misleading. Android's flawed architecture permits covert tracking, and Meta's exfiltration of private data and communications could have been prevented with stricter technical policy controls.

**E.  Standing & Harm**

83.    Since America's founding, privacy has been a legally protected interest at the local, state, and federal levels. *See Patel v. Facebook, Inc.*, 932 F.3d 1264, 1271-72 (9th Cir. 2019) (*quoting Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)) ("Privacy rights have long been regarded as 'providing a basis for a lawsuit in English or American courts.'"); and *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) ("Violations of the right to privacy have long been actionable at common law").

84.    The invasion of privacy rights is a "concrete and particularized" injury sufficient to confer standing. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) ("Various intangible harms can also be concrete [including] . . . disclosure of private information"); *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 596 (9th Cir. 2020) (holding that Facebook's

20

tracking of browsing histories that were sold to advertisers was an "invasion of [a] legally protected interest that is concrete and particularized").

85.    Plaintiff alleges he and Class Members were personally injured when Meta impermissibly obtained their personal information, including data sufficient to enable Meta to ascertain a user's location, their communications with non-Meta websites and apps, and track their website activity over time, and thus target specific users with advertisements tailored to their location and/or browsing history.

86.    It is black-letter law that such allegations are sufficient to confer Article III standing. *See, e.g., Mastel v. Miniclip SA*, 2021 WL 2983198, at *6 (E.D. Cal. July 15, 2021) (collection of "personal information without the plaintiff's consent involved a sufficiently 'concrete' injury"); *In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 402 F.Supp.3d 767, 784 (N.D. Cal. 2019)(dissemination to third parties of plaintiffs' personal information is "sufficient to confer [Article III] standing").

87.    Separate from an invasion-of-privacy harm, Plaintiff also alleges economic harm sufficient for Article III standing by alleging that user data carries financial value, and by alleging that Meta profited from the misappropriated data.

88.    Courts regularly find such allegations sufficient to confer standing on plaintiffs alleging violations of their privacy rights under CIPA. See, e.g., *Shah v. Fandom, Inc.* __ F. Supp. 3d __, 2024 WL 4539577 (N.D. Cal. Oct. 21, 2024)(plaintiffs had standing based on allegations that "the collection of their IP addresses through the Tracking Tools allows the third parties to obtain 'personally identifying, non-anonymized information,' and that the IP addresses reveal geographical location and other personal information sufficient for third parties to conduct targeted advertising"); *Mirmalek v. Los Angeles Times Comm'ns LLC*, 2024 WL 5102709, at *4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educational Sys. Inc.,* 742 F. Supp. 3d 1072, 1078 (C.D. Cal. 2024) (plaintiff had standing based on allegations that defendant collected plaintiff's information, thereby constituting an invasion of privacy which is an "actionable injur[y]").

89.    Meta's interception, disclosure, and monetization of consumer data harmed Plaintiff and the Class. Conservative estimates suggest that, in 2018, Internet companies earned

21

$202 per American user from mining and selling data, and estimates for 2022 were as high as $434 per user, constituting over $200 billion industry wide.

90.    The value of health data in particular is well-known. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data, observing that the market for this data is both lucrative and a significant risk to privacy.[8]

91.    There is also a market for data in which consumers can participate. Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

92.    Several companies have products through which they pay consumers for a license to track their data. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

93.    Personal information has private value beyond its use as a bare commodity.[9] The value of personal information is thus inherently related to the value of privacy, which is a question that has been researched in multiple fields including decision science, economics, information

---

[8] *See* https://time.com/4588104/medical-data-industry/ (last visited April 25, 2023).

[9] Wagner, et. al (2018); Acquisti, Alessandro, Curtis Taylor, and Liad Wagman (2016); Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021).

22

systems, management, health care, and marketing.[10] This research has approached the valuation of personal information from multiple perspectives:[11]

> (a)   The amount one would accept to relinquish their data;
>
> (b)   The amount one would spend to protect their data;
>
> (c)   The potential harm from data exposure; and
>
> (d)   The benefit a data holder could gain from acquiring data.

94.   These approaches can be used to establish a set of data points for the reasonable estimation of the value of personal information and non-public medical information such as patient status.

95.   In addition, numerous services exist that charge fees to monitor and remove personal information from data brokers and search databases. For example, Privacy Bee charges $197 per year.[12] Other similar services exist today, such as DeleteMe®, which removes information from all major data broker websites for $129 per year,[13] deleteme™ which charges one-time fees ranging from $100 to $500 for search engine and data breach removals,[14] Incogni.com which charges $179 per year to remove information from major data broker websites and search databases,[15] and ReputationDefender, a service that charges $99 per year to remove

---

[10] Fehrenbach David, Carolina Herrando. "The effect of customer-perceived value when paying for a product with personal data: A real-life experimental study." *Journal of Business Research* 137 (2021): 222-232; Li, Xiao-Bai, Xiaoping Liu, and Luvai Motiwalla (2021); Alorwu, et al. (2024).

[11] Acquisti, Alessandro, Curtis Taylor, and Liad Wagman (2016).

[12] Privacy Bee - Pricing, privacybee.com, accessed September 26, 2024.

[13] Privacy Protection Plans - JoinDeleteMe, joindeleteme.com, accessed September 26, 2024.

[14] Deleteme - Services Pricing, deleteme.com, accessed September 26, 2024.

[15] Incogni – About Us, incogni.com, accessed September 26, 2024.

personal information from various databases.[16] These provide a baseline market valuation of personal information

### G. Meta Obtained Consumer's Data without Consent

96.    Meta has a vast web of privacy policies that describe the information it collects from Facebook and Instagram users.

97.    However, none of these policies cover the specific issue in this case, and even Google warned Meta that its conduct violations Android's own terms of service and policies.

98.    To the extent Meta will inevitably argue that users consented to its collection of their data via the scheme described herein (which they did not and could not have), Meta exceeded the scope of that consent when it: (1) engaged in the illegal conduct described here; (2) opened a backdoor into Android devices in order to exfiltrate data it would not have otherwise had access to; (3) linked browsing data and communications to specific individuals; and (4) eavesdropped on millions of people who thought their web browsing activities were private as they used the web browsers on their Android devices.

99.    Plaintiff and Class Members had a reasonable expectation of privacy when they used the web browser(s) on their Android devices because—amongst other things—Google specifically represented that their browsing activities would remain private.

100.    Additionally, Meta's Tracking Tools and sophisticated scheme were completely invisible to Android users.

101.    Plaintiff and Class Members had no knowledge that Meta—a company completely unrelated to Google—was intercepting and exfiltrating their private internet browsing sessions, including the contents of their communications, as they used their Android devices.

102.    In addition to being wholly unaware of these unauthorized and illegitimate data pipelines, Plaintiff and Class Members were also unaware that Meta was systematically identifying

---

[16] ReputationDefender signup, me.reputationdefender.com, accessed September 26, 2024. ReputationDefender was previously known as Reputation.com and has been offering this service since at least 2012. Also see: https://www.nytimes.com/2012/12/09/business/company-envisions-vaults-for-personal-data.html

24

them and linking their internet browsing activities and private communications to their real world identity.

103.    By installing its Tracking Tools without Plaintiff's and Class Members' prior consent and without a court order, Meta violated multiple state and federal laws.

104.    In doing so, Meta violated Plaintiff's and Class Members' right to privacy and the control of their personal information as they used the Android web browser(s).

105.    Meta enriched itself by intercepting, exfiltrating, and monetizing data it would not have otherwise had access to, including but not limited to Plaintiff's and Class Member's private information, which it used for marketing, advertising, identity resolution, analytics, and similar services it offers and profits from.

***Plaintiff John Ginder***

106.    Plaintiff John Ginder owns a Samsung Galaxy S24 that he used, and continues to use, as his personal cell phone, including September 2024 to present.

107.    Like all other Samsung smartphones and tablets, Plaintiff Ginder's device uses the Android operating system, which is a mobile operating system designed by Google.

108.    Plaintiff John Ginder has a Google account, which is necessary in order to fully utilize his phone's features and capabilities. Plaintiff Ginder has had a Facebook account for several years, and the Facebook mobile app is installed on his Android device.

109.    Plaintiff Ginder stays logged into his Facebook account on his Android device as opposed to logging in and out of the app each time he uses it.  During the relevant time period, Plaintiff Ginder regularly used the Google Chrome web browser on his Android device, including in "Incognito" mode device in order to maintain confidentiality and control over his sensitive data.

110.    Plaintiff Ginder greatly values his privacy, and this is what attracted him to Android products as compared to other competitors on the market.

111.    During the relevant time period, Plaintiff Ginder communicated sensitive and private facts via his Android web browser, including on websites that contain the Meta Pixel and other Meta Tracking Tools.

112. For example, Plaintiff Ginder communicated sensitive geolocation data, medical information, personally identifiable information, and financial information when he completed loan applications and accessed banking records, used medical websites to communicate his personal and private medical conditions and symptoms, and completed various purchases on his Android device.

113. As a result of Meta's unlawful conduct and Android's inherent design flaws, Meta tracked, intercepted, collected, identified, and monetized Plaintiff's sensitive web browsing history and communications.

114. Plaintiff Ginder values his privacy, and he did not consent to Meta installing an invisible data pipeline on his Android device via the scheme described herein, nor did he consent to Meta's wiretapping, collection, and monetization of his web browsing data as he used his Android web browser.

115. Meta invaded Plaintiff Ginder's right to privacy and violated CIPA, including §§ 631(a) and 638.51(a), and was unjustly enriched by its interception, collection, matching, and monetization of data derived from the private web browser located on Plaintiff Ginder's Android device.

116. Plaintiff Ginder's also relied on Google's representations that Android devices are secure and private, and he reasonably believe that Google's representations concerning privacy and security accurately reflected their actual practices.

117. Plaintiff Ginder would not have purchased or used an Android device had he known the truth about Google's materially misleading misrepresentations and omissions.

118. Plaintiff Ginder can no longer enjoy full use of his Android device as a result of Meta and Google's conduct. Plaintiff wants to continue using his Android device, which cost approximately $1000 at the time of purchase, but he can no longer rely on Google's representations that his Android device is safe and secure.

## TOLLING

119. Any applicable statute of limitations has been tolled by the "delayed discovery" rule. Plaintiff and Class Members did not know (and had no way of knowing) that their private

26

information, data, and communications were intercepted, recorded, and monetized by Meta when they used the web browser on their Android device because the nature of the violation, which was carried out in secret through Meta's exploitation of a highly technical security vulnerability could not have been discovered by any reasonable investigation that Plaintiff or other Class members could have conducted. Moreover, Plaintiff had no duty to inquire as to the existence of a secret data pipeline because there was no indication that Meta had created such a pipeline sufficient to trigger a reasonable inquiry.

## CLASS ACTION ALLEGATIONS

120.    **Class Definition:** Plaintiff brings this action on behalf of himself and other similarly situated individuals defined as follows:

> **Meta Class:** All Android users in the United States with a Facebook or Instagram account who (i) have the Facebook or Instagram app installed on their Android device, (ii) used their Android device to access a website between September 2024 and June 2, 2025, and (iii) whose browsing information was collected by Meta.

> **Google Class:** All Android users in the United States with a Facebook or Instagram account who (i) have the Facebook or Instagram app installed on their Android device, (ii) used their Android device to access a website between September 2024 and June 2, 2025 while using the Google Chrome web browser; (iii) have a Google account; and (iv) whose browsing information was collected by Meta.

> **California Subclass:** All Android users in California with a Facebook or Instagram account who (i) have the Facebook or Instagram app installed on their Android device, (ii) used their Android device to access a website between September 2024 and June 2, 2025, and (iii) whose browsing information was collected by Meta.

121.    Plaintiff reserves the right to modify the class definitions or add sub-classes as needed prior to filing a motion for class certification.

122.    The "Class Period" is the period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling,

27

concealment, and accrual issues, and ending on the date of entry of judgment or preliminary approval of a settlement.

123.   Excluded from the Class are Defendants; any affiliate, parent, or subsidiary of Defendants; any entity in which Defendants have a controlling interest; any officer director, or employee of Defendants; any successor or assign of Defendants; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

124.   Numerosity/Ascertainability. Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff currently. However, it is estimated that there are millions of individuals in the Class. The identity of such membership is readily ascertainable from Defendants' records and non-party records.

125.   Typicality. Plaintiff's claims are typical of the claims of the Class because Plaintiff used a web browser on his Android device while he was logged into the Facebook app on that device, and he's a Google Chrome user with a Google account. Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

126.   Adequacy. Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class Members.  Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the Class Members.

127.   Common Questions of Law and Fact Predominate/Well Defined Community of Interest. Questions of law and fact common to the Class Members predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendant's wrongful conduct.  The following questions of law and fact are common to the Class:

28

(a)    Whether Meta intentionally intercepted or eavesdropped on internet communications when it was not a party to those communications;

(b)    Whether Meta installed and utilized a pen register and/or trap and trace device on consumers' Android devices;

(c)    Whether Meta violated Plaintiff's and Class Members' privacy rights via the conduct alleged herein;

(d)    Whether Meta's acts and practices alleged herein are highly offensive to a reasonable person;

(e)    Whether Plaintiff and Class Members are entitled to damages under the ECPA, CIPA, or any other relevant statute(s);

(f)    Whether Google materially misrepresented its security features and Android's capabilities with regard to privacy and security;

(g)    Whether Google materially misrepresented that is Google Incognito feature was safe and secure means of maintaining anonymity as to third parties such as Meta;

(h)    Whether Google's conduct constitutes a breach of contract;

128.    Superiority. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff is unaware of any special difficulty in litigating this action that would preclude its maintenance as a class action.

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. § 2510, *et seq.***
**(On Behalf of Plaintiff and the Meta Class)**

129.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Meta Class.

130.    The Federal Wiretap Act ("FWA"), as amended by the Electronic Communications Privacy Act of 1986 ("ECPA"), prohibits the intentional interception, use, or disclosure of any wire, oral, or electronic communication.

131.    In relevant part, the ECPA prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring "any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).

132.    The ECPA protects both sending and receipt of communications.

133.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

134.    The transmissions of Plaintiff's Private Information via Meta's Tracking Tools and hacking scheme qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

135.    **Electronic Communications**. The transmission of Plaintiff and Class Members' Private Information within the internet browsers of their Android devices are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

136.    **Content.** The ECPA defines content, when used with respect to electronic communications, to "include[] *any* information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

30

137.    **Interception.** The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

138.    **Electronic, Mechanical, or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

(a)    the Meta Pixel;

(b)    Meta's Code;

(c)    Any other tracking code or Tracking Tools used by Meta; and

(d)    Meta's practice of violating Android's own protocols to open a hidden data pipeline into web browsers installed on Android devices.

139.    Plaintiff and Class Members' interactions with websites within their web browsers are electronic communications under the ECPA.

140.    Pursuant to the scheme described herein, Meta intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

141.    Meta intercepted communications that include, but are not limited to, communications to/from Plaintiff and Class Members regarding their health, travel, shopping habits, consumption of media, loan applications, banking information, and more. This confidential information is then added to consumer profiles and monetized for targeted advertising purposes, among other things.

142.    By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Meta violated 18 U.S.C. § 2511(1)(d).

31

143. Meta intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, intrusion upon seclusion, CIPA, and other state wiretapping and data privacy laws, among others.

144. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, "[t]he association of Plaintiffs' data with preexisting user profiles is a further use of Plaintiffs' data that satisfies [the crime-tort] exception," because it "violate[s] state law, including the [CIPA], intrusion upon seclusion, and invasion of privacy." *Brown v. Google, LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021); *see also Marden v. LMND Medical Group, Inc.*, 2024 WL 4448684, at *2 (N.D. Cal. July 3, 2024); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024).

145. Meta was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

146. Plaintiff and Class Members did not authorize Meta to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy. Plaintiff and Class Members had a reasonable expectation that Meta would not open a back door data pipeline into their Android devices.

147. The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq*.

148. As a result of each and every violation thereof, on behalf of himself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, et seq. under 18 U.S.C. § 2520.

32

**SECOND CAUSE OF ACTION**
**Breach of Contract**
**(On behalf of Plaintiff and the Google Class)**

149.  Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the GoogleClass.

150.  Google's relationship with its users is governed by the Google Terms of Service, the Google Chrome and Chrome OS Additional Terms of Service, and the Chrome Privacy Notice, which incorporate and/or should be construed consistent with the Privacy Policy, the "Search & Browse Privately" page, and the Incognito Screen.

151.  As more fully set forth in the images and statements contained in paragraphs 65-75, Google promised to provide "[p]owerful, proactive protection that's built right into your Android device to help keep your data safe." Google also represents that it provides the "world's most advanced security" in order to protect user's privacy.

152.  Google breached these promises. Amongst other things, the Android operating system contains inherent design flaws that create risks not present in competitor devices (such as Apple's iOS operating system). Google knew about this weaknesses in the Android design infrastructure but nonetheless represented that the inherent risks posed by its lax structure would not occur.

153.  Google also promised to detect threats before they occurred and to provide timely updates to guard against security risks: "[o]ngoing updates provide fixes for possible issues and upgrade your device's safety features to help battle evolving threats."

154.  Google also breached these promises. Google should have detected the risks and corrected them as early as 2014 when Yandex—a Russian tech company whose data servers are largely housed in Moscow—engaged in the exact same conduct as Meta.

155.  Plaintiff and Class members fulfilled their obligations under the relevant contracts and are not in breach of any of their obligations.

156.  As a result of Google's breach(es), Meta was able to obtain the personal property of Plaintiffs and Class Members. Plaintiff and Class Members also did not receive the benefit of

33

the bargain for which they contracted and for which they paid valuable consideration when they purchased their Android devices.

157.    To make matters worse, Yandex—a foreign entity for whom it will be likely impossible to obtain third-party discovery from—has been hacking into Android devices for nearly a decade. It's unclear what kind of information Yandex obtained from U.S. citizens, but this presents an even bigger risk that Google, an American company, should have guarded against.

158.    Plaintiff, on behalf of himself and Class Members, seeks compensatory damages, consequential damages, and/or non-restitutionary disgorgement in an amount to be proven at trial, and declarative, injunctive, or other equitable relief.

### THIRD CAUSE OF ACTION
**Common Law Invasion of Privacy – Intrusion Upon Seclusion**
**(On Behalf of Plaintiff and the Meta Class)**

159.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Classes.

160.    To state a claim for intrusion upon seclusion "[Plaintiffs] must possess a legally protected privacy interest … [Plaintiffs'] expectations of privacy must be reasonable … [and Plaintiffs] must show that the intrusion is so serious in 'nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.'" *Hernandez v. Hillsides, Inc*. 47 Cal. 4th 272, 286-87 (2009).

161.    Plaintiff and Class Members have an interest in: (i) precluding the dissemination and/or misuse of their sensitive, confidential communications and information; and (ii) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to highly intrusive surveillance at every turn.

162.    By conducting such widespread surveillance and gaining illegitimate access to web browsers on millions of Android devices, Meta intentionally invaded Plaintiff's and Class Members' privacy rights and intruded upon Plaintiff's and Class Members' seclusion.

163.    Plaintiff's and Class Members had a reasonable expectation that their communications, identities, personal activities, health, and other data would remain confidential when they used the web browsers installed on their Android devices.

164.    Plaintiff's and Class Members did not and could not authorize Meta to intercept data in the manner described herein, and Google own statements and representations demonstrate that Meta violated Google's own policies.

165.    Meta's conduct is highly offensive to a reasonable person and constitutes an egregious breach of social norms.

166.    Meta's conduct, from its amassment of data to its blatant disregard for Android sandboxing protocols, poses a serious risk reflecting all aspects of Plaintiff's and Class Members' lives.

167.    In addition, Meta's conduct and data collection via the scheme described herein can be used to further invade Plaintiff's and Class Members' privacy by, for example, allowing third parties to learn intimate details of their lives and target them for advertising, political, and other purposes without their consent.

168.    Accordingly, Plaintiff and Class Members seek all relief available for invasion of privacy claims under common law.

**FOURTH CAUSE OF ACTION**
**Violation of the California Invasion of Privacy Act,**
**Cal. Penal Code § 631, *et seq.***
**(On Behalf of Plaintiff and the California Subclass)**

169.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein and brings this count individually and on behalf of the California Subclass.

170.    The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630 to 638.  The Act begins with its statement of purpose.

171.    The Legislature thereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use

35

of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

172. Cal. Penal Code § 630.

173. California Penal Code § 631(a) provides, in pertinent part (emphasis added):

174. Any person who, by means of any machine, instrument, or contrivance, or in any other manner … willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or **who aids, agrees with, employs, or conspires** with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500).

175. Under CIPA, Meta must show it had the consent of all parties to a communication, and that such consent was procured prior to the interception occurring. It cannot do that in this case because, amongst other things, its course of conduct was purposefully aimed at sabotaging the purported privacy protections provided by Android devices and Google.

176. Speaker of the California Assembly, Jesse Unruh, who introduced CIPA, urged that the law "represents an important advance in California law protecting the inherent rights of our citizens to privacy in their personal affairs. It is far stronger than the laws of many states in this field, and much tougher than the proposed federal eavesdropping legislation."[17] He further emphasized that the law would act as "a powerful deterrent to those who wiretap illegally for profit."[18]

177. Meta is a "separate legal entity that offer[s] [a] 'software-as-a-service's and not merely [] passive device[s]." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).

---

[17] July 31, 1967, Letter from Rep. Jesse M. Unruh to then California governor Ronald Reagan urging him to sign CIPA into law.
[18] *Id.*

178.    Further, Meta uses the wiretapped information to its own benefit and for a purpose other than simply recording the communications and providing the communications to website operators—including but not limited to Meta's marketing business and Artificial Intelligence pursuits, but of which require vast amounts of data.

179.    Accordingly, Meta was a third party to any communications and interaction that occurred via the web browsers installed on Plaintiff and Class Members' Android devices. *Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

180.    Meta's scheme and use of Tracking Tools constitutes an electronic listening device that Meta installed on Plaintiff's and Class Members' Android devices that, without their knowledge and consent, read, attempted to read, and learned the contents of Plaintiff and Class Members' electronic communications while the electronic communications were in transit or were being sent from or received at any place within California.

181.    Meta facilitated the interception and collection of Plaintiff's and Class Members' Private Information by embedding Tracking Tools in Android devices and carrying out a scheme that manipulated Plaintiff and Class Members' devices.

182.    At all relevant times, Meta used those intercepted communications to its own benefit, including but not limited to building comprehensive user profiles to bolster its marketing business.

183.    Meta's Tracking Tools constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, they fall under the broad catch-all category of "any other manner."

184.    Plaintiff and Class Members did not provide their prior consent to Meta's intentional interception, reading, learning, recording, collection, advanced matching, and usage of Plaintiff's and Class Members' electronic communications.

185.    Any purported consent is invalid because Meta exceeded the scope of such consent as a result of Meta's conduct and act of opening a backdoor channel into Android devices via the scheme described herein.

186.    The wiretapping of Plaintiff and Class Members occurred in California.

187.     As a result of the above violations, and pursuant to CIPA Section 637.2, Meta is liable to Plaintiff and Class Members for treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the Plaintiffs have suffered, or be threatened with, actual damages."

188.     Under the statute, Meta is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Meta in the future.

## FIFTH CAUSE OF ACTION
### Violation of the California Invasion of Privacy Act,
### Cal. Penal Code § 638.51(a)
### (On Behalf of Plaintiff and the California Subclass Class)

189.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

190.     CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

191.     A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of the communication." Cal. Penal Code § 638.50(b).

192.     The Tracking Tools are "pen registers" because they are device[s] or process[es]" that "capture[d]" the "routing, addressing, or signaling information" from Plaintiff and Class Members' electronic communications. *Id.*

193.     At all relevant times, Meta installed its Tracking Tools—which are pen registers—on Plaintiff's Class Members' browsers, which enabled Meta to collect Plaintiff's and Class Members' IP addresses, geolocation, device information, and other persistent identifiers from the websites they visited. Defendants then used their Tracking Tools to build comprehensive user

profiles, which were used to unjustly enrich Meta by linking and enhancing Plaintiff's and Class Members' data.

194. Plaintiff and Class Members did not provide their consent to Meta's installation or use of the Tracking Tools, or the scheme by which it infiltrated Android devices.

195. Meta did not obtain a court order to install or use any of their Tracking Tools or engage in the conduct described herein.

196. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Meta's violations of CIPA § 638.51(a), and each seek statutory damages of $5,000 for each of Meta's violations of CIPA § 638.51(a).

**SIXTH CAUSE OF ACTION**
**Invasion of Privacy Under California's Constitution**
**(On Behalf of Plaintiff and the California Subclass)**

197. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed Class.

198. Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property and pursuing and obtaining safety, happiness, *and privacy*." The phrase "*and privacy*" was added by the "Privacy Initiative" adopted by California voters in 1972.

199. The addition of the phrase "and privacy" occurred after voters approved a proposed legislative constitutional amendment designated as Proposition 11. Proposition 11 was intended to curb businesses' control over the unauthorized collection and use of peoples' personal information, as the ballot argument stated:

200. The right of privacy is the right to be left alone. . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass

us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.[19]

201.    This amended constitutional provision addresses the concern over accelerating encroachment on personal freedom and security caused by increasing surveillance and data collection activity in contemporary society. Its proponents meant to afford individuals more measures of protection against this most modern threat to personal privacy:

202.    Computerization of records makes it possible to create 'cradle-to-grave' profiles of every American. At present there are no effective restraints on the information activities of government and business. This amendment creates a legal and enforceable right of privacy for every Californian.[20]

203.    In recognizing these privacy rights, the California Constitution provides insight into and serves to define the nature of the reasonable expectation of privacy of an objectively reasonable California resident. In contravention to the California Constitution and the reasonable expectations of privacy of California residents, Meta "stockpil[es] unnecessary information about [Class members] and [] misus[es]information gathered for one purpose in order to serve other purposes," creating "cradle-to-grave" profiles of Class members.

204.    Plaintiff and Class Members maintain a reasonable expectation of privacy in the conduct of their lives, including their internet browsing activities and in their electronic communications and exchange of personal information. The reality of modern life increasingly requires that much of our daily activities are conducted online—Plaintiff and Class Members have no practical choice or ability but to conduct their daily lives substantially in the digital world, connected to the Internet. The necessary engagement with the digital world makes Plaintiff's and Class Members' private lives susceptible to unlawful observation and recording, capable of yielding a comprehensive and intrusive chronicle of Plaintiff's and Class Members' lives. If Plaintiff and Class Members cannot have a reasonable expectation of privacy in the conduct of

---

[19] Ballot Pamp., Proposed Stats. & Amends. To Cal. Const. With Arguments to Voters. Gen. Election *26 (Nov. 7, 1972).
[20] *Id.*

40

their lives online and the digital transmission of their personal information, they can have no reasonable expectation of privacy for virtually any facet of their lives.

205. Meta, in violation of Plaintiff's and Class Members' reasonable expectation of privacy, intercepts, collects, and compiles their internet activity and communications, and engages in advanced matching whereby the data is connected to Plaintiff and Class Members' real world identities for future use in marketing, advertising, and Meta's AI pursuits.

206. The nature and volume of Meta's collected data violates Plaintiff's and Class Members' reasonable expectation of privacy because, amongst other things, Meta's conduct made key privacy features completely obsolete on Android devices.

207. Technological advances, such as Meta's use of Tracking Tools and the scheme described herein provide Meta with the means to assemble a comprehensive chronicle of Plaintiff's and Class Members' lives heretofore unseen. Meta collects and compiles personal information such as Plaintiff's and Class Members' names, postal addresses, email addresses, phone numbers, cookies, mobile device IDs, and web browsing information, including but not limited to financial information, health information, and other sensitive categories of personal information. Such information is "personal information" under California law, which defines personal information as including "[i]nternet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

208. Meta also collects and analyzes Plaintiff's and Class Members' real-world offline activity and compiles computerized records of those activities. Plaintiff and Class Members do not and cannot know which specific real-world offline activities Meta may or may not be collecting and analyzing and adding to the digital dossiers it compiles on them.

209. Meta's conduct as described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms, specifically including the following:

210. Meta engages in dragnet-style collection and interception of Plaintiff's and Class Members' Internet activity, without their consent, when they use the internet on their Android devices.

211. Meta also collects details about Plaintiff's and Class Members' *offline* activities. By its very nature, Plaintiff and Class Members cannot be aware of this.

212. Meta creates comprehensive identity profiles based on this online and offline data, which constitute precisely the sort of "cradle-to-grave profiles" the right to privacy under the California Constitution was created to constrain.

213. Meta's amassing of electronic information reflecting highly detailed aspects of Plaintiff's and Class Members' lives into dossiers, for future or present use, is in and of itself a violation of Plaintiff's and Class Members' right to privacy in light of the serious risk these dossiers pose to their autonomy. Additionally, these dossiers are and can be used to further invade Plaintiff's privacy by, inter alia, allowing third parties to learn intimate details of Plaintiff's and Class Members' lives, and target them for advertising, political, and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

214. Additionally, as described above, the social harms posed by Meta's conduct impair not only individual autonomy, but the collective autonomy of Class Members, and autonomy is essential to the proper functioning of democratic republics.

215. Meta's practices as alleged herein violate Plaintiff's and Class Members' reasonable expectation of privacy, are highly offensive to a reasonable person, and constitute an egregious breach of the social norms.

216. Meta's violation of various state and federal statutes, and its actions to enable others to violate various state and federal statutes relating to privacy protections are each an independent and egregious breach of social norms.

217. The California Constitution created an inalienable right to be free from pervasive electronic surveillance; Plaintiff and Class Members are under no obligation to "opt out" of such violations of their constitutional privacy rights to stop Meta's intrusions into their daily lives—that right inheres automatically for every Class Member.

218.    The right to privacy in California's constitution creates a right of action for California residents against private entities such as Meta. Meta lacks a legitimate business interest in stockpiling and compiling the personal information of Plaintiff and Class Members.

219.    Plaintiff and Class Members have been damaged by Meta's invasion of their privacy and are entitled to just compensation and injunctive relief.

**SEVENTH CAUSE OF ACTION**
**Violation of the California Unfair Competition Law ("UCL"),**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf of the California Subclass Against Both Defendants)**

220.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the California Subclass.

221.    Defendants are "persons" as defined by Cal. Bus. & Prof. Code § 17201.

222.    Defendants violated Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

223.    Meta's "unlawful" acts and practices include its violation of the Federal WiretapAct, 18 U.S.C. § 2510, *et seq.*; the California Invasion of Privacy Act, Cal. Penal Code §§ 631 and 632; Invasion of Privacy; and Intrusion Upon Seclusion. Google's unlawful acts include breach of contract.

224.    Meta violated, and continues to violate, the "unfair" prong of the UCL because it took Plaintiff's and the California Subclass Members' private data and communications by infiltrating their Android devices, and Meta used this data for undisclosed purposes and without consent.  Plaintiff's private data and communications are property under the laws of California and common law. Meta's unlawful taking and use of this property was immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiff and the California Subclass. Meta's unauthorized collection of Plaintiff's private browsing data and communications was made for Meta's own gain and at the expense of Plaintiff and the California Subclass.

225.    Google also violated the "unfair" prong of the UCL because it represented to Android users that its operating system provided the highest level of privacy and data security

43

when, in reality, its Android operating system contains inherent flaws that wholly undermine its statements and representations.

226. Meta violated the "fraudulent" prong of the UCL because it failed to inform Plaintiff and the California Subclass that it was collecting their private browsing data from within their Android devices' web browsers and connecting that data to Plaintiff and California Subclass members' real world identities in violation of Android's policies and privacy practices.

227. As a direct and proximate result of Defendants' unfair, unlawful, and fraudulent acts and practices, Plaintiff and California Subclass Members were injured and suffered damages, as alleged herein, including but not limited to invasion of privacy; overpayment for Android devices; and decreased value of their private and protected data.

228. Defendants acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded Plaintiff's and California Subclass Members' rights.

229. Plaintiff and California Subclass Members seek all monetary relief allowed by law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices and reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5. Plaintiff and the California Subclass are entitled to restitution as the available damages remedies are inadequate to return to Plaintiff and the California Subclass the value of the information taken. Plaintiff and the California Subclass are entitled to restitution for Defendants' unjust enrichment in a quanta that is not identical to the legal damages suffered.

230. Further, Plaintiff and the California Subclass lack an adequate remedy at law and are thus entitled to seek equitable relief. Unless restrained and enjoined, Meta will continue to misrepresent its data practices, will not recall and destroy all wrongfully collected data, and may engage in the same hacking scheme in the future. Unless restrained and enjoined, Google will continue to misrepresent its Android operating system, and it will continue supporting lax privacy architecture, which is subpar to its competitors' operating systems despite being touted as maximizing privacy. Due to the ongoing nature of the harm, damages will be insufficient to address it. Thus, injunctive relief is appropriate.

**RELIEF REQUESTED**

Plaintiff, on behalf of himself and the proposed Classes, respectfully requests that the Court grant the following relief:

(a)     Certification of this action as a class action and appointment of Plaintiff and Plaintiff's counsel to represent the Class;

(b)     A declaratory judgement that Meta violated: (1) the Electronic Communications Privacy Act; (2) the California Invasion of Privacy Act; (3) Plaintiff's and Class Members' privacy rights as provided at common law and pursuant to the California Constitution; and (4) Plaintiff's and Class Members' other rights under common law.

(c)     A declaratory judgment that Google breached its contract and violated California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200.

(d)     An order enjoining Meta from engaging in the unlawful practices and illegal acts described herein and required Google to change its representations concerning Android devices; and

(e)     An order awarding Plaintiff and the Class: (1) actual or statutory damages; (2) punitive damages—as warranted—in an amount to be determined at trial; (3) prejudgment interest on all amounts awarded; (4) injunctive relief as the Court may deem proper;  (5) reasonable attorneys' fees and expenses and costs of suit pursuant to Cal. Code of Civil Procedure § 1021.5 and/or other applicable law; (6) pre-judgment and post-judgment interest as provided by law; and (7) such other and further relief as the Court may deem appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff, individually and on behalf of the proposed Class, demands a trial by jury for all the claims asserted in this Complaint so triable.

*(REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK)*

Date:   June 30, 2025,                              Respectfully submitted,

                                                    */s/ Heather M. Lopez*
                                                    Heather Lopez (SBN 354022)
                                                    **MILBERG COLEMAN BRYSON**
                                                    **PHILLIPS GROSSMAN, PLLC**
                                                    280 S. Beverly Drive
                                                    Beverly Hills, CA  90212
                                                    Tel.:    (858) 209-6941
                                                     hlopez@milberg.com

                                                    William Edelman (SBN 285177)
                                                    **MILBERG COLEMAN BRYSON**
                                                    **PHILLIPS GROSSMAN, PLLC**
                                                    227 W. Monroe Street, Suite 2100
                                                    Chicago, IL 60606
                                                    Phone: 866.252.0878
                                                    wedelman@milberg.com

                                                    Christian Levis (*pro hac vice* forthcoming)
                                                    Amanda Fiorilla (*pro hac vice* forthcoming)
                                                    Rachel Kesten (*pro hac vice* forthcoming)
                                                    Yuanchen Lu (*pro hac vice* forthcoming)
                                                    **LOWEY DANNENBERG, P.C.**
                                                    44 South Broadway, Suite 1100
                                                    White Plains, NY 10601
                                                    Telephone: (914) 997-0500
                                                    Fax: (914) 997-0035
                                                    clevis@lowey.com
                                                    afiorilla@lowey.com
                                                    rkesten@lowey.com
                                                    ylu@lowey.com

                                                    ***Attorneys for Plaintiff and the Putative Class***